# CONSTANCE GORDON *v.* H.N.S. MANAGEMENT COMPANY, INC.

# GRANVILLE DOWNS ET AL. *v.* H.N.S. MANAGEMENT COMPANY, INC.
## (SC 17139)

Sullivan C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

Argued September 20—officially released December 21, 2004

*Richard C. Mahoney*, with whom, on the brief, was *Dennis F. McCarthy*, for the appellant (defendant).

*Paul S. Levin*, with whom was *Jefferson D. Jelly*, for the appellees (plaintiffs in both cases).

*Opinion*

SULLIVAN, C. J. The defendant, H.N.S. Management Company, Inc., doing business as Connecticut Transit, appeals from the trial court's rulings that: (1) the claims of the plaintiffs, Constance Gordon and Granville Downs,[1] that the defendant was required by General Statutes §§ 14-29[2] and 38a-

---

[1] Doris Downs, Granville Downs' wife, also is a plaintiff and sought damages for loss of consortium. For convenience, we refer to Granville Downs and Constance Gordon as the plaintiffs.

[2] General Statutes § 14-29 provides in relevant part: "(a) The commissioner shall not register any motor bus, taxicab, school bus, motor vehicle in livery service or service bus and no person may operate or cause to be operated upon any public highway any such motor vehicle until the owner or lessee thereof has procured insurance or a bond satisfactory to the commissioner, which insurance or bond shall indemnify the insured against any legal liability for personal injury, the death of any person or property damage, which injury, death or damage may result from or have been caused by the use

$336^3$ to purchase uninsured and underinsured motorist insurance for the buses that it operated pursuant to contracts with the state were not barred by the doctrine of sovereign immunity; and (2) as a matter of statutory interpretation, a motor bus is a type of motor vehicle subject to the uninsured and underinsured motorist insurance provisions of the statutes. We conclude that the trial court improperly determined that the defendant was not entitled to raise sovereign immunity as a defense to the plaintiffs' claims. We further conclude that the state has not waived its sovereign immunity with respect to such claims. Accordingly, we need not consider the defendant's second claim on appeal.[4]

The record reveals the following facts and procedural history. Each plaintiff brought a separate action. In the Gordon case, the parties stipulated that Gordon was a passenger on a bus operated by the defendant in the city of Hartford on April 24, 1996. They further stipulated that she was injured when the driver of an unidentified motor vehicle cut in front of the bus and forced the bus driver to brake abruptly, thereby causing Gordon to fall. Gordon claimed that she was entitled to recover uninsured motorist benefits from the defendant pursuant to General Statutes § 38a-334 et seq.

or operation of such motor vehicle described in the contract of insurance or such bond. . . ."

[3] General Statutes § 38a-336 provides in relevant part: "(a) (1) Each automobile liability insurance policy shall provide insurance, herein called uninsured and underinsured motorist coverage, in accordance with the regulations adopted pursuant to section 38a-334, with limits for bodily injury or death not less than those specified in subsection (a) of section 14-112, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and underinsured motor vehicles and insured motor vehicles, the insurer of which becomes insolvent prior to payment of such damages, because of bodily injury, including death resulting therefrom. . . ."

[4] Even if we were to conclude that the defendant is not entitled to raise a defense of sovereign immunity, we would not reach the merits of the statutory interpretation claim because the trial court's ruling on that issue was not an appealable final judgment. See footnote 12 of this opinion.

In the Downs case, Downs alleged that he was driving a bus operated by the defendant in the city of East Hartford on August 23, 1995. He further alleged that he was injured when a motor vehicle, driven by Steven Grant, collided with the bus. Downs claimed that he had exhausted the insurance coverage available to Grant and was entitled to recover underinsured motorist benefits from the defendant. In his amended complaint, he sought a judgment declaring that the defendant had an obligation to provide underinsured motorist coverage pursuant to §§ 14-29 and 38a-336 (f).

In each case, the defendant claimed as a special defense that the plaintiff's claim was barred by the doctrine of sovereign immunity. After the cases were consolidated for trial, the court held a hearing on the sovereign immunity issue on December 18, 2001.[5] At that hearing, the defendant argued that it was entitled to assert a sovereign immunity defense under the criteria set forth in *Dolnack* v. *Metro-North Commuter Railroad Co.*, 33 Conn. App. 832, 639 A.2d 530 (1994).[6] In support of its claim, the defendant presented testimony by Michael Sanders, the transit and rideshare administrator of the state department of transportation (department); David A. Lee, the general manager of First Transit, formerly known as ATE Management and Services Company; and Stephen Botticello, the defendant's director of finance.

---

[5] It appears from the record that the defendant did not file a motion to dismiss on the ground of sovereign immunity. The transcript of the December 18, 2001 hearing indicates that the issue arose during the course of a hearing on another matter and that the court sua sponte ordered the parties to file offers of proof and briefs on the issue at that time.

[6] As we discuss later in this opinion, those criteria include whether: (1) the entity was created by the state; (2) the entity is subject to control by the state; (3) the entity does the state's work; (4) the state has a pecuniary interest or a substantive right in need of protection; and (5) the entity is financially dependent on the state. *Dolnack* v. *Metro-North Commuter Railroad Co.*, supra, 33 Conn. App. 835–37.

Sanders testified that, since 1979, the department has hired private management companies to operate public transportation services in certain areas of the state. The state has a contract for such services with First Transit and the defendant.[7] The defendant is an operating subsidiary of First Transit and is responsible for handling the day-to-day public transportation services in the greater Hartford, greater New Haven and greater Stamford areas. Bus services in these areas originally were provided by private companies. Ultimately, the state "took over the bus system" and hired management and operating companies to keep the system going for the benefit of the public. The state, not the defendant, owns all of the capital assets required for the operation of the business, including the buses and the premises where the defendant's offices are located. Sanders also testified that, pursuant to the contracts between the defendant and the state, all bus fares become state property the moment that the defendant's employees collect them. In turn, the state supplies all of the money for the defendant's operating budget. Operating expenses exceed the revenues from fares.

Sanders testified that the "overall system" is subject to the control and oversight of the department, although the defendant handles the day-to-day operations, such

[7] After the December 18, 2001 hearing, the defendant provided the trial court with copies of the relevant contracts between the state and the defendant. Agreement No. 11.01-99 (95), entitled "AN AGREEMENT BETWEEN THE STATE OF CONNECTICUT AND HNS MANAGEMENT COMPANY, INC. AND ATE MANAGEMENT AND SERVICE COMPANY, INC. FOR PROFESSIONAL TRANSIT MANAGEMENT SERVICES STATE PROJECT NO. 400-013," covered the period commencing on April 1, 1995, and ending on March 31, 1996, and was in effect at the time that Downs was injured. Agreement No. 10.01-99 (96), entitled "AN AGREEMENT BETWEEN THE STATE OF CONNECTICUT AND HNS MANAGEMENT AND SERVICE COMPANY, INC. AND RYDER/ATE FOR PROFESSIONAL TRANSIT MANAGEMENT SERVICES," covered the period commencing on April 1, 1996, and ending on March 31, 2001, and was in effect at the time that Gordon was injured. The terms of the two contracts were substantially identical.

as the hiring of bus drivers. The state is contractually responsible for providing liability insurance for the buses operated by the defendant. Any tort claims for which the defendant becomes liable are paid by the state as part of the defendant's operating budget. Sanders testified that the commissioner of the department is statutorily empowered both to determine whether public transportation services are a public benefit that should be provided and to take action to ensure that such services are made available. The buses operated by the defendant are registered through the ordinary procedures for state property and have "state-numbered" registration plates.

Lee testified that he is First Transit's liaison with the department and that he reports to Sanders. The defendant was created to carry out First Transit's responsibilities under its contracts with the state. Neither First Transit nor the defendant owns any assets related to the public transportation operation. The state owns the buildings in which their offices are located, everything in the buildings and the buses. First Transit is authorized to purchase small items such as stationery and office supplies. The state licenses and inspects the buses before turning them over to the defendant. First Transit contributes no money to the defendant's operating budget, which is funded entirely by the state.

Lee further testified that the state is contractually responsible for purchasing liability insurance for the buses. The defendant has authority to settle tort claims up to a certain dollar limit. Settlements above that limit require approval from the department. The defendant pays any settlements or judgments arising from tort claims against it, but the money comes out of the operating funds provided by the state. Under their contracts with the state, First Transit and the defendant agreed to waive sovereign immunity as a defense to all claims unless otherwise requested by the state. Harry

P. Harris, the chief of the department's bureau of public transportation, wrote to Lee on April 10, 2000, and instructed him that the defendant was authorized to assert sovereign immunity as a defense to any claims alleging that the defendant was subject to § 38a-336, which governs uninsured and underinsured motorist coverage.[8]

Lee further testified that the state originally had purchased the assets of a former Connecticut company and had contracted with another private corporation to operate the bus services. Because the state had used federal funds to purchase the Connecticut company's assets, it was required by federal law to maintain that corporation's collective bargaining agreement with its employees. When the state entered into a contract with First Transit's predecessor corporation, that corporation inherited the collective bargaining agreement. The agreement has been in place since that time. When the agreement comes up for renegotiation, the defendant is restricted by the budget and guidelines that the department provides. The defendant is authorized to purchase small office supply items and other routine supplies, but higher cost expenditures require state approval. The defendant is self-insured for workers'

[8] Harris' letter to Lee was introduced as an exhibit at the December 18, 2001 hearing. It states: "In preparing our response to your letter of March 17, 2000 we have attached the related letter of February 15 from Assistant Attorney General Charles Walsh to Attorney Richard Mahoney. We have also enclosed the referenced letter of August 14, 1989 from Assistant Attorney General Jane D. Comerford which addresses the uninsured motorist coverage question.

"We agree with the position expressed by Attorney Comerford that CTTransit, as an agent of the State, should be exempt from the requirement to carry Uninsured Motorist coverage. Therefore, I hereby request that H.N.S. Management Company Inc. (dba CTTransit) utilize and avail itself of the State's governmental immunity for the limited purpose of contending with the issue of the applicability of [§] . . . 38a-336 (uninsured and underinsured motorist coverage).

"We hope that this clarifies our stance on this issue."

compensation. In practice, that means that the defendant pays any awards and is reimbursed by the state.

Botticello testified that he is responsible for the defendant's day-to-day financial operations. He estimates monthly operating costs and submits the estimates to the state approximately one month in advance. The state transfers operating funds to the defendant in bimonthly installments. If the money is insufficient to cover the monthly costs, Botticello adds the shortfall to the next monthly cost estimate. The state is the defendant's only source of funding. The defendant deposits the fares that it collects into a state bank account on a daily basis. It collects approximately $22 million in fares annually and has an annual operating budget of approximately $66 million.

The plaintiffs did not offer any independent evidence at the December 18, 2001 hearing, but relied entirely on cross-examination of the defendant's witnesses. Sanders testified on cross-examination that he is aware that certain private companies provide bus transportation services within the state and that companies that operate without state involvement are required to obtain a certificate of necessity pursuant to General Statutes § 13b-80.[9] The requirement in General Statutes § 13b-38k (b)[10] that state agencies "provide for the maxi-

---

[9] General Statutes § 13b-80 provides in relevant part: "No person, association, limited liability company or corporation shall operate a motor bus without having obtained a certificate from the Department of Transportation or from the Federal Highway Administration pursuant to the Bus Regulatory Reform Act of 1982, P.L. 97-261, specifying the route and certifying that public convenience and necessity require the operation of a motor bus or motor buses over such route. . . ."

[10] General Statutes § 13b-38k (b) provides: "Any program funded by a state, federal or municipal agency for the purpose of providing paratransit services through a state agency, municipality, planning agency or transit district shall provide for the maximum feasible participation of private, for-profit operators of paratransit vehicles by affording such operators a full and reasonable opportunity to enter a competitive bid on all contracts for the provision of any paratransit services."

mum feasible participation of private, for-profit operators" in the provision of public transportation services is consistent with the department's philosophy and practices. Sanders testified that the defendant does not collect sufficient fares to cover its operating expenses and that the state treasury makes up the difference. The defendant "can't lose money because that really is the state's bus operation." If the defendant's performance is deficient, however, then the state can terminate the contract. The state pays a management fee of approximately $50,000 per month to First Transit.

Sanders further testified on cross-examination that the defendant is contractually responsible for management of the three transit divisions, central office administrative functions and labor management of all employees required to provide transit services, among other duties. The defendant is also contractually obligated to abide by all applicable state laws. The contract provides that the state will purchase tort liability insurance for the transportation enterprise and that, if it fails to do so, the defendant will purchase such insurance and will be reimbursed by the state. The "bureau chief" issued a document to the defendant authorizing it to assert a sovereign immunity defense to uninsured motorist claims. The contract also provides that the state will indemnify the defendant for tort liability but is not directly obligated to the defendant's creditors or employees.

Lee testified on cross-examination that it is his responsibility to keep the department "happy" so that First Transit will not lose the management contract when it comes up for renewal. He also testified that the defendant is a wholly owned subsidiary of First Transit, which is a profit-making entity. First Transit is in the business of running public transit operations throughout the country and has approximately fifty management contracts like the one it has with the

department. The state does not appoint the defendant's board of directors. Instead, the members of First Transit's board of directors also serve as the defendant's board of directors. The defendant handles employee administration without direct interference or control by the state. It does not, however, set the parameters for union contract negotiations. The defendant purchases health insurance, dental insurance and other fringe benefits for its employees. Before Lee received the letter from Harris instructing him to assert sovereign immunity as a defense to claims involving uninsured motorist coverage, no one at the department had advised Lee that "uninsured motorist insurance was not required to be provided" to the defendant.

On recross-examination, Lee testified that, under the collective bargaining agreement between the defendant and its nonmanagement employees, the defendant is entitled to "exercise the exclusive right to set its policy; to manage its business in the light of experience . . . good business judgment and changing conditions; to determine the amount of service to be run at any and all time[s]; to direct the working force; to determine the number of its employees at any time; to determine the qualifications for and select its managerial forces and all new employees; to make reasonable rules and regulations governing the operation of its business and the conduct of its employees; to enforce discipline for violation of rules and other misconduct; to suspend and discharge its employees for cause." Lee testified that, as a practical matter, the defendant is required to make many of those determinations subject to the approval of the department. For example, the defendant is not authorized to eliminate particular bus routes.[11]

---

[11] Paragraph eight of the contracts between the state and the defendant; see footnote 7 of this opinion; provides in relevant part that "the State has the sole authority as to the rates of fare to be charged, the routes to be operated and the service to be rendered [by the defendant] . . . ."

Botticello testified on cross-examination that the defendant issues paychecks to its employees. The state is not a party to the collective bargaining agreement between the defendant and its employees.

The trial court issued a memorandum of decision in which it concluded that the defendant had possession of the buses, not under a lease, but under "a bailment." The court also concluded, however, that the defendant was a lessee and, as such, was required to purchase uninsured motorist insurance for the buses pursuant to § 38a-336. Finally, the court concluded that "[t]his action is against the defendant and the doctrine of sovereign immunity does not apply."

The defendant appealed from the trial court's decision to the Appellate Court. The plaintiff in the first case then filed a motion for articulation in which it asked the trial court to clarify whether it had intended to issue a final ruling on the issue of statutory interpretation or, instead, to rule only on the issue of sovereign immunity.[12] The trial court issued an articulation indicating that it had intended to reach both issues and to render a final judgment. We subsequently transferred the defendant's appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[12] The plaintiff in the first case stated in its motion that it required the articulation because, "if the [trial court] reached all issues, then, in fact, this was a final judgment which may be subject to an interlocutory appeal and there will be no question for the Appellate Court [as to] what it is reviewing. On the other hand, if the [c]ourt did not reach the question of statutory interpretation and only decided the issue of sovereign immunity, then this is not a final judgment and an interlocutory appeal would clearly be inappropriate." The denial of a motion to dismiss based on a claim of sovereign immunity is an immediately appealable final judgment, however. See *Martinez* v. *Dept. of Public Safety*, 263 Conn. 74, 77 n.5, 818 A.2d 758 (2003). Moreover, the trial court's ruling on the question of statutory interpretation ordinarily would not be an appealable final judgment in the absence of a determination of damages. See *Stroiney* v. *Crescent Lake Tax District*, 197 Conn. 82, 84, 495 A.2d 1063 (1985) (judgment as to liability only, without determination of damages, is interlocutory in character and not appealable).

The defendant claims on appeal that the trial court improperly failed to consider whether, under the facts of this case, the defendant was an "arm of the state" entitled to assert the defense of sovereign immunity. It also claims that the trial court improperly determined as a matter of statutory interpretation that the defendant was required to purchase uninsured and underinsured motorist insurance on the motor buses that it operates. We agree with the defendant that the trial court failed to apply the appropriate standard or to engage in the required fact-finding in making its determination that the defendant was not entitled to raise a sovereign immunity defense to the plaintiffs' claim. We further conclude that the defendant was entitled to assert such a defense. In light of this conclusion, we do not reach the defendant's second claim.

As a preliminary matter, we set forth our standard of review. "[T]he doctrine of sovereign immunity implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law." (Internal quotation marks omitted.) *Bloom* v. *Gershon*, 271 Conn. 96, 113, 856 A.2d 335 (2004). "When issues of fact are necessary to the determination of a court's jurisdiction, [however] due process requires that a trial-like hearing be held, in which an opportunity is provided to present evidence and to cross-examine adverse witnesses." (Internal quotation marks omitted.) *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 695–96, 600 A.2d 1019 (1991). When an evidentiary hearing is required to determine the trial court's subject matter jurisdiction, we engage in a two part inquiry. Cf. *State* v. *Torres*, 85 Conn. App. 303, 315, 858 A.2d 776 (2004) (court engages in two part inquiry when reviewing trial court's decision on motion to suppress, which involves mixed question of fact and law). "We determine first whether the facts found by the

court were clearly erroneous and then conduct a plenary review of the court's legal conclusions." Id.

This court previously has not had the opportunity to consider what factors are relevant to a trial court's factual determination of whether an entity with the attributes of a private corporation may, as an "arm of the state," raise a sovereign immunity defense.[13] We have considered, however, the factors that should be considered in determining whether an individual should be treated as a state official entitled to claim sovereign immunity. In *Spring* v. *Constantino*, 168 Conn. 563, 362 A.2d 871 (1975), the plaintiff brought a legal malpractice action against an attorney who had represented the plaintiff as a public defender. The state filed a special appearance on behalf of the defendant attorney and argued that the action was barred by the doctrine of sovereign immunity. Id., 564. The trial court agreed and dismissed the action. Id. On appeal, we recognized that "[t]he fact that the state is not named as a defendant does not conclusively establish that the action is not within the principle which prohibits actions against the sovereign without its consent. . . . The vital test is to be found in the essential nature and effect of the proceeding." (Internal quotation marks omitted.) Id., 568. We identified the following criteria for determining

---

[13] The plaintiffs in the present case argue that our decision in *Voltz* v. *Orange Volunteer Fire Assn., Inc.*, 118 Conn. 307, 172 A. 220 (1934), addressed this question and supports the trial court's determination. In *Voltz*, the plaintiff sued a volunteer fire association and its members for damages for personal injuries. Id., 308–309. The defendant association argued that it was entitled to claim governmental immunity because the town of Orange (town) had accepted its services and contributed to its support. Id., 309–10. This court concluded that "[t]he association was not a branch or department of the town but an independent corporation voluntarily assuming to perform certain functions which the town itself might have performed, and it is liable for the negligence of its servants or agents acting within the scope of their authority." Id., 310. To the extent that this language suggests that an independent corporation or agency can never raise a defense of governmental immunity, we now disavow any such suggestion.

whether an action against an individual is, in effect, against the state and barred by the doctrine of sovereign immunity: "(1) a state official has been sued; (2) the suit concerns some matter in which that official represents the state; (3) the state is the real party against whom relief is sought; and (4) the judgment, though nominally against the official, will operate to control the activities of the state or subject it to liability." Id. We further concluded that the criteria for determining whether a defendant is a public official are whether the individual possesses: "(1) an authority conferred by law, (2) a fixed tenure of office, and (3) the power to exercise some portion of the sovereign functions of government. . . . A key element of this test is that the 'officer' is carrying out a sovereign function." (Citations omitted.) Id., 568–69. Applying this test, we concluded that the defendant was not a state official because "it [could] hardly be argued that the actual conduct of the defense of an individual is a sovereign or governmental act." Id., 569. We did not rule out the possibility, however, that an individual who was not employed by the state, but who carried out a governmental function, could be a "state official" for purposes of meeting the first of the four criteria for determining whether sovereign immunity may be claimed.

The Appellate Court considered a similar issue in *Dolnack* v. *Metro-North Commuter Railroad Co.*, supra, 33 Conn. App. 832, 834, 837, namely, whether a New York "public benefits corporation" was an "arm of the state" entitled to raise sovereign immunity as a defense. Relying exclusively on cases from other jurisdictions, the court identified several factors for making this determination, including whether: (1) the entity was created by the state; id., 836; (2) the entity is subject to control by the state; id.; (3) the entity does the state's work; id., 836–37; (4) the state has a pecuniary interest or a substantive right in need of protection; id., 836;

and (5) the entity is financially dependent on the state.[14]

[14] The cases cited by the Appellate Court in *Dolnack* fall generally into two categories. In the first category of cases, the dispute centered on whether the defendant was an arm of the state entitled to assert sovereign immunity. See *Deal* v. *Tannehill Furnace & Foundry Commission,* 443 So. 2d 1213 (Ala. 1993) (considering whether body created by legislative enactment is arm of state); *Guthrie* v. *North Carolina State Ports Authority,* 307 N.C. 522, 299 S.E.2d 618 (1983) (same); *Specter* v. *Commonwealth,* 462 Pa. 474, 341 A.2d 481 (1975) (distinguishing between entity that is instrumentality of commonwealth, which is not necessarily entitled to claim sovereign immunity, and integral part of commonwealth, which is) (superseded by statute); *Prendergast* v. *Northern Virginia Regional Park Authority,* 227 Va. 190, 313 S.E.2d 399 (1984) (distinguishing between entity that is arm of state and entity that is under local governmental control); *Ohio Valley Contractors* v. *Board of Education,* 170 W. Va. 240, 293 S.E.2d 437 (1982) (distinguishing between state agency and public corporation); see also *Armory Commission of Alabama* v. *Staudt,* 388 So. 2d 991 (Ala. 1980) (same); *Pagan* v. *Sarasota County Public Hospital Board,* 884 So. 2d 257 (Fla. App. 2d Dist. 2004) (considering whether entity characterized by injured parties as private medical practice was agency of state), review denied, 894 So. 2d 971 (Fla. 2005); *Kentucky Center for the Arts Corp.* v. *Berns,* 801 S.W.2d 327 (Ky. 1991) (distinguishing between state agency and municipal corporation); *Mullins* v. *State,* 387 So. 2d 1151 (La. 1980) (distinguishing between state agency and local governmental institution) (superseded by statute); *Rucker* v. *Harford County,* 316 Md. 275, 558 A.2d 399 (1989) (same); *Bell* v. *New York Higher Education Assistance Corp.,* 138 Misc. 2d 932, 526 N.Y.S.2d 316 (1987) (distinguishing between state agency and corporation created by state); *DeVeaux* v. *Palmer,* 125 Pa. Commw. 631, 558 A.2d 166 (1989) (same); *Garrettson* v. *Commonwealth,* 46 Pa. Commw. 136, 405 A.2d 1146 (1979) (distinguishing between state agency and independent agency created by state); *Kettner* v. *Wausau Ins. Cos.,* 191 Wis. 2d 723, 530 N.W.2d 399 (1995) (distinguishing between servant of state, which is entitled to claim sovereign immunity, and independent contractor, which is not).

In the second category of cases, there was no dispute as to whether the defendant, as a general matter, could assert sovereign immunity as an agent of the state; instead, the dispute centered on whether the type of claim was one that could be brought against the defendant despite its general immunity to suit. See *Ex parte State,* 245 Ala. 193, 16 So. 2d 187 (1943) (action against state official that seeks neither to affect interest of state nor to take away its property does not violate sovereign immunity); *Robb* v. *Sutton,* 147 Ill. App. 3d 710, 498 N.E.2d 267 (1986) (judgment against state employee that operates to control actions of state or to subject it to liability is deemed action against state); *Lefebvre* v. *Somersworth Shoe Co.,* 93 N.H. 354, 41 A.2d 924 (1945) (action against state officer in which state has no pecuniary interest or substantive right to protect is not action against state); *Glassman* v. *Glassman,* 309 N.Y. 436, 131 N.E.2d 721 (1956) (action against state agency

Id., 837. The court stated that "all of the above characteristics must be examined before a trial court can conclude that a governmental body is entitled to sovereign immunity." Id. Having identified these criteria, the court concluded that the factual record in the case before it was not adequate for the trial court to have made such a determination. Id., 838–39.

We also find instructive the criteria that this court has identified for determining whether a hybrid public-private entity is a public agency for purposes of subjecting it to General Statutes § 1-210, the Freedom of Information Act (FOIA). In *Connecticut Humane Society* v. *Freedom of Information Commission*, 218 Conn. 757, 591 A.2d 395 (1991), we considered whether the Connecticut Humane Society (society) was such a public agency. We noted that we previously had determined that the FOIA included within its scope any entity that is "the functional equivalent of a public agency . . . ." Id., 760. "In determining whether an entity is the functional equivalent of a public agency, we consider the following criteria: (1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of government involvement or regulation; and (4) whether the entity was created by the government."[15] (Internal quotation marks omitted.)

that does not stand to lose anything as result of litigation is not action against state); *Fidelity & Deposit Co. of Maryland* v. *Shaid*, 103 W. Va. 432, 137 S.E. 878 (1927) (action against state agency that challenges agency's exercise of judgment and discretion and seeks money damages is barred by sovereign immunity). All of the cases in the second category suggest that when the state is only a nominal defendant, sovereign immunity is not a bar to suit. That principle has no application in the present case. Accordingly, we focus on the first category of cases.

[15] Although we find *Connecticut Humane Society* instructive, we recognize that the considerations underlying a determination as to whether an entity is a public agency for purposes of the FOIA are not necessarily the same as those underlying a determination as to whether an entity is entitled to assert a sovereign immunity defense. The purpose of the FOIA is to provide public access to governmental information while the purpose of the doctrine of sovereign immunity is to protect the state from liability for private litigation that may interfere with the functioning of state government

Id. "All relevant factors are to be considered cumulatively, with no single factor being essential or conclusive." (Internal quotation marks omitted.) Id., 761. We concluded in *Connecticut Humane Society* that the society was not a public agency because, although many of the society's activities were authorized by statute and properly could be characterized as traditional governmental functions, the state did not provide any funds

and may impose fiscal burdens on the state. See *Pamela B.* v. *Ment*, 244 Conn. 296, 328, 709 A.2d 1089 (1998). We note, for example, that the Appellate Court has suggested that an entity that engages in a governmental function but "has no power to govern, to regulate or to make decisions affecting government"; *Domestic Violence Services of Greater New Haven, Inc.* v. *Freedom of Information Commission*, 47 Conn. App. 466, 475, 704 A.2d 827 (1998); cannot be the functional equivalent of a public agency for FOIA purposes. Id. In support of this conclusion, the Appellate Court cited *Washington Research Project, Inc.* v. *Dept. of Health, Education & Welfare*, 504 F.2d 238 (D.C. Cir. 1974). That case involved a request for disclosure under the federal Freedom of Information Act, 5 U.S.C. § 552, which requires disclosure of "the final opinions and identifiable records of each agency of the government . . . ." *Washington Research Project, Inc.* v. *Dept. of Health, Education & Welfare*, supra, 244. Under federal law, intra-agency memoranda that would not be subject to discovery in litigation are exempt from disclosure. Id.; compare General Statutes § 1-210 (e) (1) (disclosure of intra-agency memoranda generally is required). The plaintiff in *Washington Research Project, Inc.*, sought disclosure of certain materials from a number of " 'initial review groups' " within the National Institute of Mental Health that were comprised of nongovernmental consultants. *Washington Research Project, Inc.* v. *Dept. of Health, Education & Welfare*, supra, 242. The court concluded that, because the groups did not have any authority to make final decisions, they were not "agencies" subject to the federal Freedom of Information Act, but were units within an agency. Id., 248.

We need not decide in the present case whether, contrary to our suggestion in *Connecticut Humane Society* and the cases cited therein that the state's control of an agency is determinative, the Appellate Court correctly held that an entity that "has no power to govern, to regulate or to make decisions affecting government"; *Domestic Violence Services of Greater New Haven, Inc.* v. *Freedom of Information Commission*, supra, 47 Conn. App. 475; cannot be a public agency for FOIA purposes. For the reasons set forth in the text of this opinion, we conclude that, for purposes of determining whether an entity is entitled to assert a sovereign immunity defense, the relevant criterion is the degree of the state's control over the entity, not the degree of the entity's control over state functions.

to the society; id., 763; it did not control or regulate the society; id., 765; the society was not subject to governmental oversight; id.; the society was self-directed; id.; and its employees were not government employees. Id.

Having reviewed the relevant authorities, we conclude that the criteria for determining whether a corporate entity is an arm of the state entitled to assert sovereign immunity as a defense are whether: (1) the state created the entity and expressed an intention in the enabling legislation that the entity be treated as a state agency;[16] (2) the entity was created for a public purpose or to carry out a function integral to state government;[17] (3) the entity is financially dependent on

[16] See *Dolnack* v. *Metro-North Commuter Railroad Co.*, supra, 33 Conn. App. 835–36; see also *Armory Commission of Alabama* v. *Staudt*, 388 So. 2d 991, 992–93 (Ala. 1980); *Pagan* v. *Sarasota County Public Hospital Board*, No. 2D02-5672, 2004 WL 1809862 (Fla. App. 2d Dist. 2004); *Rucker* v. *Harford County*, 316 Md. 275, 281, 558 A.2d 399 (1989); *Bell* v. *New York Higher Education Assistance Corp.*, 138 Misc. 2d 932, 934, 526 N.Y.S.2d 316 (1987); *Guthrie* v. *North Carolina State Ports Authority*, 307 N.C. 522, 532, 299 S.E.2d 618 (1983); *Specter* v. *Commonwealth*, 462 Pa. 474, 484, 341 A.2d 481 (1975); *DeVeaux* v. *Palmer*, 125 Pa. Commw. 631, 558 A.2d 166, 168 (1989); *Bradley* v. *Pennsylvania Turnpike Commission*, 121 Pa. Commw. 51, 550 A.2d 261, 262–63 (1988); *Garrettson* v. *Commonwealth*, 46 Pa. Commw. 136, 405 A.2d 1146, 1148 (1979); *Prendergast* v. *Northern Virginia Regional Park Authority*, 227 Va. 190, 194, 313 S.E.2d 399 (1984); *Ohio Valley Contractors* v. *Board of Education*, 170 W. Va. 240, 242, 293 S.E.2d 437 (1982).

[17] See *Connecticut Humane Society* v. *Freedom of Information Commission*, supra, 218 Conn. 764 (prevention of cruelty to animals, sheltering of abused animals, collection of fees from owners and enforcement of animal cruelty laws are governmental functions); *Dolnack* v. *Metro-North Commuter Railroad Co.*, supra, 33 Conn. App. 832; see also *Deal* v. *Tannehill Furnace & Foundry Commission*, 443 So. 2d 1213, 1216 (Ala. 1993) ("holding, maintaining, and preserving state lands of historical significance for the benefit of our citizens" is important function of state government); *Kentucky Center for the Arts Corp.* v. *Berns*, 801 S.W.2d 327, 331–32 (Ky. 1991) (corporation performing substantially same functions as any private entity engaged in entertainment business is not carrying out function integral to state government); *Mullins* v. *State*, 387 So. 2d 1151, 1152–53 (La. 1980) (conducting investigation concerning manner and cause of any death resulting from violence or accident is state function); *Bell* v. *New York Higher Education Assistance Corp.*, 138 Misc. 2d 932, 934, 526 N.Y.S.2d 316 (1987) (coordina-

the state;[18] (4) the entity's officers, directors or trustees are state functionaries;[19] (5) the entity is operated by state employees;[20] (6) the state has the right to control the entity;[21] (7) the entity's budget, expenditures and appropriations are closely monitored by the

tion of state's administrative efforts in student financial aid and loan programs with other branches of government is governmental function); *Guthrie* v. *North Carolina State Ports Authority,* 307 N.C. 522, 528, 532, 299 S.E.2d 618 (1983) (promoting, developing, constructing, equipping, maintaining and operating harbors and seaports within state is public purpose); *Specter* v. *Commonwealth,* 462 Pa. 474, 493, 341 A.2d 481 (1975) (construction of turnpike by independent agency was not governmental function even though construction of same turnpike by state would have been) (superseded by statute); *DeVeaux* v. *Palmer,* 125 Pa. Commw. 631, 558 A.2d 166, 168 (1989) (providing reasonably priced professional malpractice insurance to health care providers and ensuring that injured persons will obtain prompt and fair compensation is governmental function); *Garrettson* v. *Commonwealth,* 46 Pa. Commw. 136, 405 A.2d 1146, 1148 (1979) (regulation of manufacture of and transactions in alcoholic drinks is governmental function); *Ohio Valley Contractors* v. *Board of Education,* 170 W. Va. 240, 242, 293 S.E.2d 437 (1982) (fact that education is statewide concern does not mean that board of education is arm of state when board is subject to local control).

[18] See *Connecticut Humane Society* v. *Freedom of Information Commission,* supra, 218 Conn. 760; *Dolnack* v. *Metro-North Commuter Railroad Co.,* supra, 33 Conn. App. 836–37; see also *Deal* v. *Tannehill Furnace & Foundry Commission,* 443 So. 2d 1213, 1216 (Ala. 1993); *Pagan* v. *Sarasota County Public Hospital Board,* No. 2D02-5672, 2004 WL 1809862 (Fla. App. 2d Dist. 2004); *Kentucky Center for the Arts Corp.* v. *Berns,* 801 S.W.2d 327, 331 (Ky. 1991); *Rucker* v. *Harford County,* 316 Md. 275, 282–83, 558 A.2d 399 (1989); *Specter* v. *Commonwealth,* 462 Pa. 474, 481, 341 A.2d 481 (1975); *DeVeaux* v. *Palmer,* 125 Pa. Commw. 631, 558 A.2d 166, 168 (1989); *Garrettson* v. *Commonwealth,* 46 Pa. Commw. 136, 405 A.2d 1146, 1148 (1979); *Ohio Valley Contractors* v. *Board of Education,* 170 W. Va. 240, 242, 293 S.E.2d 437 (1982).

[19] See *Connecticut Humane Society* v. *Freedom of Information Commission,* supra, 218 Conn. 765; see also *Pagan* v. *Sarasota County Public Hospital Board,* No. 2D02-5672, 2004 WL 1809862 (Fla. App. 2d Dist. 2004); *Kentucky Center for the Arts Corp.* v. *Berns,* 801 S.W.2d 327, 331 (Ky. 1991); *Bell* v. *New York Higher Education Assistance Corp.,* 138 Misc. 2d 932, 934, 526 N.Y.S.2d 316 (1987).

[20] See *Connecticut Humane Society* v. *Freedom of Information Commission,* supra, 218 Conn. 765; see also *Bell* v. *New York Higher Education Assistance Corp.,* 138 Misc. 2d 932, 934, 526 N.Y.S.2d 316 (1987).

[21] See *Connecticut Humane Society* v. *Freedom of Information Commission,* supra, 218 Conn. 760; *Dolnack* v. *Metro-North Commuter Railroad*

state;[22] and (8) a judgment against the entity would have the same effect as a judgment against the state.[23] To establish that an entity is an arm of the state, an entity need not satisfy every criteria. Rather, "[a]ll relevant factors are to be considered cumulatively, with no single factor being essential or conclusive." (Internal quotation marks omitted.) *Connecticut Humane Society* v. *Freedom of Information Commission*, supra, 218 Conn. 761. We recognize that these criteria are somewhat interrelated and overlapping. For example, a determination that an entity is completely financially dependent on the state could lead to an inference that the entity is controlled by the state. Similarly, a determination that the state has the right to control the entity could lend support to a determination that a judgment against the entity would affect the state.

With these principles in mind, we first address the plaintiffs' claim that the defendant has waived appellate review by failing to provide an adequate record for review. Although the defendant argued at the December 18, 2001 hearing that it was entitled to assert sovereign immunity under *Dolnack*, the trial court's memorandum of decision did not mention *Dolnack* and, as the plain-

*Co.*, supra, 33 Conn. App. 836; see also *Deal* v. *Tannehill Furnace & Foundry Commission*, 443 So. 2d 1213, 1216 (Ala. 1993); *Pagan* v. *Sarasota County Public Hospital Board*, No. 2D02-5672, 2004 WL 1809862 (Fla. App. 2d Dist. 2004); *Kentucky Center for the Arts Corp.* v. *Berns*, 801 S.W.2d 327, 331 (Ky. 1991); *Mullins* v. *State*, 387 So. 2d 1151, 1153 (La. 1980); *Rucker* v. *Harford County*, 316 Md. 275, 281–84, 558 A.2d 399 (1989); *Specter* v. *Commonwealth*, 462 Pa. 474, 484–85, 341 A.2d 481 (1975); *Prendergast* v. *Northern Virginia Regional Park Authority*, 227 Va. 190, 194, 313 S.E.2d 399 (1984); *Ohio Valley Contractors* v. *Board of Education*, 170 W. Va. 240, 242, 293 S.E.2d 437 (1982); *Kettner* v. *Wausau Ins. Cos.*, 191 Wis. 2d 723, 737, 530 N.W.2d 399 (1995).

[22] See *Bell* v. *New York Higher Education Assistance Corp.*, 138 Misc. 2d 932, 934, 526 N.Y.S.2d 316 (1987).

[23] See *Spring* v. *Constantino*, supra, 168 Conn. 568; see also *Deal* v. *Tannehill Furnace & Foundry Commission*, 443 So. 2d 1213, 1216 (Ala. 1993); *Bell* v. *New York Higher Education Assistance Corp.*, 138 Misc. 2d 932, 934, 526 N.Y.S.2d 316 (1987).

tiffs point out, the court made no express findings of fact with respect to any of the criteria set forth in that case for establishing that an entity should be treated as an "arm of the state." The plaintiffs also point out that the defendant did not seek an articulation of the court's decision.

We agree with the plaintiffs that, ordinarily, "[i]t is incumbent upon the appellant to take the necessary steps to sustain its burden of providing an adequate record for appellate review. . . . [A]n appellate tribunal cannot render a decision without first fully understanding the disposition being appealed. . . . Our role is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claims] would be entirely speculative." (Citations omitted; internal quotation marks omitted.) *Gladstone, Schwartz, Baroff & Blum* v. *Hovhannissian*, 53 Conn. App. 122, 127, 728 A.2d 1140 (1999). Two considerations persuade us, however, to consider the merits of the defendant's claim in the present case. First, the defendant's claim on appeal implicates the trial court's subject matter jurisdiction, an issue that can never be waived.[24] Second, although the parties disagree about the legal conclusions to be drawn from the evidence presented at the December 18, 2001 hearing, neither party disputes the basic underlying facts or challenges the credibility of the witnesses at that hearing. Accordingly, the record is adequate for review.

[24] See *Miller* v. *Egan*, 265 Conn. 301, 324, 828 A.2d 549 (2003) (because doctrine of sovereign immunity implicates court's subject matter jurisdiction, issue must be considered when court becomes aware of it); but see *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 24–25, 664 A.2d 719 (1995) (court is not bound to consider claim of governmental immunity if not pleaded as special defense).

We turn, therefore, to the substance of the defendant's claim. A review of the evidence presented at the December 18, 2001 hearing reveals that the defendant has met five of the criteria for establishing that it is an arm of the state. First, we conclude that the bus service operated by the defendant is a governmental function. The commissioner of the department is authorized by General Statutes § 13b-34[25] to enter into contracts with operating companies such as the defendant. The powers conferred by that statute are in furtherance of the express legislative policy that "[i]mprovement in the transportation of people and goods within, to and from the state by rail, motor carrier or other mode of mass transportation on land is essential for the welfare of the citizens of the state and for the development of its resources, commerce and industry. The development and maintenance of a modern, efficient and adequate system of motor and rail facilities and services is required. . . ." General Statutes § 13b-32. The bus service run by the defendant is not a private enterprise operated for the purpose of generating profit, but is a government service created for the benefit of the public pursuant to the legislature's determination that such services are essential to the general welfare of the state.

The fact that the defendant's parent company derives a profit from the enterprise does not affect our conclusion. Presumably, the only reason that any private entity would agree to perform a governmental function would be to earn a profit. If we were to conclude that that fact, in and of itself, is sufficient to deprive the function of its essential governmental nature, then no private entity ever could be considered an arm of the state

---

[25] General Statutes § 13b-34 (a) provides in relevant part: "The commissioner shall have power, in order to aid or promote the operation . . . of any transportation service operating to, from or in the state, to contract in the name of the state with any person . . . for purposes of initiating, continuing, developing, providing or improving any such transportation service. . . ."

for sovereign immunity purposes. That result would be untenable in an era when an increasing number of essential governmental functions are carried out by private entities. Nor does the fact that the bus operations were at one time fully owned and controlled by private companies affect our conclusion. It is reasonable to conclude that the state took over the private bus companies because it made a policy determination that the provision of an adequate bus system is essential for the general welfare and that the government, rather than private companies, should determine what is adequate. See General Statutes § 13b-32. The state itself does not make a profit on the enterprise.

Second, the defendant is entirely financially dependent on the state. All of its operating expenses are paid by the state on a monthly basis. The state takes ownership of the passenger fares as soon as they are received by the defendant and the defendant has no other source of revenue. Moreover, the state owns all of the assets required to operate the defendant's business, including the buildings in which it has its offices, everything in the buildings, and the buses.

Third, the bus service operated by the defendant is subject to the control and oversight of the state through the department. The department has complete control over bus routes, schedules and fares. Thus, all major issues of policy, planning and operations relating to the enterprise's core governmental function are controlled by the state. The fact that the defendant independently handles routine internal employment administration, benefits and discipline matters is immaterial. Presumably, the internal administration of any state agency is handled at the lowest feasible operational level.

Fourth, the defendant's budget is closely monitored by the state. The defendant submits annual and monthly

budget estimates to the department for approval and the state provides the requested funds on a bimonthly basis.

Finally, we conclude that a judgment against the defendant would have the same effect as a judgment against the state. As a practical matter, a declaratory judgment that the defendant was required to purchase uninsured and underinsured motorist insurance for the buses would require the state to provide such insurance for all state owned buses operated by private operating companies. That, in turn, could affect the state's decisions on how many buses to operate and where and how often to run them. In addition, although the defendant pays settlements and judgments against it, payment of any damage award ultimately would have to be reimbursed by the state under the indemnification clauses of the contracts.[26]

We recognize that the defendant has not met several of the criteria for establishing that it is an arm of the state. Specifically, although the enterprise operated by the defendant was created pursuant to statute, the defendant itself was not created by statute, but was created by, and is a wholly owned subsidiary of, a pri-

---

[26] The plaintiffs argue that "[w]hile there [are] indemnification provisions in the contract between the [defendant] and the [state] insofar as tort liability is concerned, there are no provisions which would obligate the state treasury to pay for the appellant's contractual liability in this context." They point out that, under *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 384, 698 A.2d 859 (1997), an action to recover uninsured motorist payments is "not an action in tort but, rather, an action in contract."

In *Dodd*, however, the action characterized as an "action in contract" was an action for uninsured motorist benefits brought by an insured against his insurance carrier under a contract of insurance. Id., 378. In the present case, there is no contract of insurance. Accordingly, the plaintiffs' actions cannot be characterized as contract actions. Rather, the plaintiffs' actions against the defendant seeking damages for personal injuries under the theory that the defendant breached its statutory duty to the plaintiffs by failing to insure the buses for uninsured and underinsured motorist claims can only be characterized as tort actions, at least for purposes of the indemnification clauses of the contracts between the defendant and the state.

vate, for-profit corporation.[27] Moreover, the defendant's officers and directors are not state functionaries, but are the officers and directors of its private parent corporation. Finally, the defendant's employees are not state employees.

Considering all of the factors together, however, and keeping in mind that the purpose of the sovereign immunity doctrine is to protect the state from liability for private litigation that may interfere with the functioning of state government and may impose fiscal burdens on the state; see *Pamela B.* v. *Ment*, 244 Conn. 296, 328, 709 A.2d 1089 (1998); we conclude that the defendant is an arm of the state and is entitled to claim sovereign immunity. In light of the underlying purpose of the doctrine of sovereign immunity, we give particular weight to our determinations that any money judgment against the defendant ultimately will be paid out of state coffers and any declaratory judgment against the defendant could interfere with a governmental function, namely, the state's operation of its system of public transportation. Such results are precisely what the doctrine of sovereign immunity was intended to protect against.

The plaintiffs have not identified any express waiver by the state of its sovereign immunity in this context and conceded at oral argument before this court that this court's determination that the defendant is entitled to raise sovereign immunity as a defense would be dispositive of this appeal.[28] Accordingly, we need not

---

[27] We note, however, that there is some indication that the state believed at the time that the defendant was created that the *purpose* for which it was created would entitle it to claim sovereign immunity. The contracts between the state and the defendant prohibit the defendant from raising sovereign immunity as a defense without the state's permission. There would have been no reason for this contractual prohibition if the state had not believed that, in its absence, the defendant could raise the defense.

[28] Relying on this court's decision in *Conzo* v. *Aetna Ins. Co.*, 243 Conn. 677, 705 A.2d 1020 (1998), the plaintiffs argued in their brief to this court that "the result that employees of only this private for profit corporation

reach the defendant's claim that the trial court improperly determined that a motor bus is a type of vehicle subject to the provisions of § 38a-336.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment dismissing the plaintiffs' complaints.

In this opinion the other justices concurred.

would not have extended to them the same uninsured motorist benefits that all other private sector employees in the state enjoy simply because the state owns the vehicle which the employee was driving . . . would be . . . absurd and bizarre . . . and not consistent with the uniform scheme" contemplated by the legislature. In *Conzo* we concluded that, because the legislature intended to create a uniform scheme of uninsured motorist insurance coverage, a self-insured employer must provide uninsured motorist benefits to an employee who is injured in the course of his employment while occupying a motor vehicle owned by his employer. *Conzo* v. *Aetna Ins. Co.*, supra, 686. *Conzo* did not involve a claim against the state, however, and the plaintiffs have not identified any statute or other instrument in which the state clearly and unequivocally has indicated that it is subject to the provisions of the uninsured motorist statutes. See *St. George* v. *Gordon*, 264 Conn. 538, 561, 825 A.2d 90 (2003) (legislature may waive state's sovereign immunity provided clear intention to that effect is disclosed by use of express terms or by force of necessary implication).